1
2
3
4
5
6
7
8          IN THE UNITED STATES DISTRICT COURT
9        FOR THE NORTHERN DISTRICT OF CALIFORNIA
10
11   ENVIRONMENTAL PROTECTION          No. C 04-04647 CRB
     INFORMATION CENTER, et al.,
12                                     **MEMORANDUM AND ORDER**
                  Plaintiffs,
13
         v.
14
     UNITED STATES FISH AND WILDLIFE
15   SERVICE, et al.,
16                Defendants.
                                              /
17
18          This lawsuit challenges the logging of forests on private land in Humboldt County,

19   California.  Now pending before the Court are two motions.

20          First, defendants U.S. Fish & Wildlife Service ("the Service") and NOAA Fisheries,

21   (collectively "Federal Defendants") move for dismissal/summary judgment of the second

22   claim for relief alleging that Federal Defendants must supplement the environmental impact

23   statement ("EIS") pursuant to the National Environmental Policy Act ("NEPA"); and the

24   seventh claim for relief seeking an order pursuant to the Endangered Species Act ("ESA")

25   requiring Federal Defendants to revoke the incidental take permit issued to defendant Pacific

26   Lumber Company ("PALCO") on the ground that PALCO has violated the Habitat

27   Conservation Plan ("Conservation Plan") adopted in connection with the permit.

28

*United States District Court*

*For the Northern District of California*

United States District Court

For the Northern District of California

1    Second, plaintiffs move for a preliminary injunction of PALCO's logging activities

2    authorized under the Conservation Plan/Take Permit based on the likely merits of the NEPA

3    claim and the fifteenth claim for relief. The latter claim alleges that the Service's recent

4    conclusion that PALCO's logging activity poses "no jeopardy" to marbled murrelets was

5    arbitrary and capricious.

6                              **BACKGROUND**

7    Signed in 1999, the Headwaters Accord represented the efforts of timber companies,

8    state and federal governments, and environmental interest groups to provide a compromise

9    between the timber industry's interest in harvesting timber stands, including old-growth

10   redwood, on their lands and environmentalists' interest in protecting endangered species,

11   such as the marbled murrelet. The Agreement provided for the sale of certain lands to the

12   government and set aside other lands for murrelet protection, as well as created a

13   comprehensive plan for murrelet habitat conservation.

14       **A.    The Legal Landscape: ESA and NEPA**

15   Under the ESA it is illegal for any person to "take" threatened or endangered species.

16   See 16 U.S.C. § 1538(a)(1)(B). Section 10 of the ESA creates an exception to the rule

17   against takes. "It grants [the Service] the power to issue permits allowing for the take of

18   listed species that incidentally results from lawful activities on private property." Southwest

19   Center for Biological Diversity v. Berg, 268 F.3d 810, 814 (9th Cir. 2001) (citing 16 U.S.C.

20   § 1539(a)(1)(B)). To obtain a take permit, a party must develop a habitat conservation plan

21   "that provides for ongoing mitigation efforts to minimize the project's future impact on

22   protected species." Id. (citing 16 U.S.C. § 1539(a)(2); 50 C.F.R. § 17.22).

23   The issuance, or rather, consideration of whether to issue, a take permit also requires

24   the Service to initiate consultation pursuant to section 7 of the ESA. Whenever an agency

25   action may affect an ESA-listed species, "the agency planning the action, usually known as

26   the 'action agency,' must consult with the consulting agency. This process is known as a

27   'Section 7' consultation. . . . After consultation and analysis, the consulting agency then

28

2

**United States District Court**

**For the Northern District of California**

1   prepares a biological opinion." <u>National Wildlife Federation v. National Marine Fisheries</u>

2   <u>Service</u>, 422 F.3d 782, 790 (9th Cir. 2005).

> 3   The consulting agency evaluates the effects of the proposed action on the
> survival of species and any potential destruction or adverse modification of
> 4   critical habitat in a biological opinion, 16 U.S.C. § 1536(b), based on the "best
> scientific and commercial data available," <u>id.</u> at § 1536(a)(2).  The biological
> 5   opinion includes a summary of the information upon which the opinion is
> based, a discussion of the effects of the action on listed species or critical
> 6   habitat, and the consulting agency's opinion on "whether the action is likely to
> jeopardize the continued existence of a listed species or result in the destruction
> 7   or adverse modification of critical habitat . . . ."  50 C.F.R. § 402.14(h).

8   <u>Id.</u>   "If the biological opinion concludes that jeopardy is not likely and that there will not be

9   adverse modification of critical habitat, or that there is a 'reasonable and prudent alternative'

10   to the agency action that avoids jeopardy and adverse modification and that the incidental

11   taking of endangered or threatened species will not violate section 7(a)(2), the consulting

12   agency can issue an "Incidental Take Statement" which, if followed, exempts the agency

13   action from the prohibition on takings found in Section 9 of the ESA."  <u>Id.</u>  (citation and

14   footnote omitted).  If, on the other hand, the agency determines that "an agency's action may

15   jeopardize the survival of species protected by the ESA, or adversely modify a species'

16   critical habitat, the action must be modified."  <u>Id.</u>

17       The issuance of a take permit may also require a federal agency to prepare an EIS

18   pursuant to NEPA.  <u>See</u> 42 U.S.C. § 4332(2)(C) (mandating that federal agencies prepare an

19   EIS for "major federal actions" "significantly affecting the quality of the human

20   environment");  <u>see also</u> <u>Norton v. Southern Utah Wilderness Alliance</u>, 542 U.S. 55, 124 S.

21   Ct. 2373, 2384 (2004) ("NEPA requires a federal agency to prepare an environmental impact

22   statement (EIS) as part of any 'proposals for legislation and other major Federal actions

23   significantly affecting the quality of the human environment.'") (citation omitted); <u>Ramsey v.</u>

24   <u>Kantor</u>, 96 F.3d 434, 444 (9th Cir. 1996) (holding that if a federal takings permit is a

25   prerequisite for a project with an adverse impact on the environment, the relevant federal

26   agency may be required to prepare an EIS).

27   //

28   //

3

United States District Court

For the Northern District of California

**B.      The 1999 Biological Opinion**

As part of the Headwaters Accord, the Service issued an incidental take permit to PALCO that allowed for the "take" of marbled murrelets under the conditions set forth in the Conservation Plan and Implementation Agreement (the "Take Permit").  These documents–the Conservation Plan, Take Permit, and  Implementation Agreement–collectively outline the responsibilities of PALCO and Federal Defendants in executing the Accord.

Because the Service's issuance of the PALCO Take Permit would affect the marbled murrelet, the Service completed its own consultation process in 1999 that resulted in a biological opinion concluding that, under the conditions set forth in the Conservation Plan and Implementation Agreement, PALCO's logging activities would not jeopardize the marbled murrelet ("1999 BiOp").  The Service subsequently issued the Take Permit and logging commenced.

**C.      The New Information**

Plaintiffs premise their claims on new information which has emerged in the last few years.

First, in two internal memoranda, the Service assessed the impacts of a 1997 and two 1999 oil spills off the coast of PALCO lands and southern Oregon.  Pursuant to ESA section 10, the Service examined the effects of the spills to determine if the spills constituted "unforeseen circumstances" that require additional conservation measures.  An April 2002 memorandum ("April 2002 Memo") authored by a Service biologist indicates her belief that the oil spills did in fact constitute such "unforeseen circumstances."  In October 2002, a Service supervisor reviewed the April 2002 Memo and determined in a further memorandum ("October 2002 Memo") that the spills did not constitute an "unforseen circumstance" under the Conservation Plan and ESA.  The October 2002 Memo ended the Service's ESA section 10 analysis of those oil spills.

Second, in 2004 an independent environmental consulting group commissioned by the Service released an "Evaluation Report for the 5-Year Status Review of the Marbled

4

**United States District Court**

For the Northern District of California

1   Murrelet in Washington, Oregon, and California" ("McShane Report"), as required by the

2   ESA.  <u>See</u> 16 U.S.C. § 1533(c)(2).  The McShane Report evaluated the status of the marbled

3   murrelet by answering three primary questions:  (1) whether there is a distinct population

4   segment of the marbled murrelet in California, Oregon, and Washington; (2) whether there is

5   new information about threats to the population; and (3) if there is new information, whether

6   it suggests a change in the listed status.  <u>See</u> Pl.'s Exh. C (McShane Report at ES-1-2).

7   Based on a new population modeling methodology, the McShane Report ultimately

8   determined that the "environmental baseline" for the marbled murrelet may be less favorable

9   than the 1999 BiOp assumed.

10       Third, according to plaintiffs, throughout the implementation of the Headwaters

11  Accord, a "Conservation Plan Monitor" has documented as many as 325 PALCO violations

12  of the Conservation Plan, Take Permit, and Implementation Agreement.

13       Fourth, on September 20, 2005, the Service reinitiated internal consultation pursuant

14  to ESA section 7 based on the McShane Report and "natural resource damage assessments"

15  regarding the three oil spills.  The letter indicating reinitiation was released simultaneously

16  with a new biological opinion ("2005 BiOp").  The 2005 BiOp concluded that, in light of the

17  new information, there are still no "impacts to [marbled murrelets] that are not identified and

18  considered in the [1999 BiOp]," and that "continued operations under the PALCO [Take

19  Permit] are not likely to jeopardize the continued existence of the marbled murrelet."  2005

20  BiOp Cover Letter at 19.

21                          **PROCEDURAL HISTORY**

22       Plaintiffs subsequently filed this lawsuit against PALCO and Federal Defendants

23  making thirteen claims for relief pursuant to the ESA, NEPA, Clean Water Act, and

24  California unfair business practices laws.  Federal Defendants and PALCO filed motions to

25  dismiss several of the claims for relief.

26       The Court dismissed the third and eighth claims without leave to amend and dismissed

27  the second claim for relief under NEPA with leave to amend.  With respect to the NEPA

28  claim, the Court held that plaintiffs had not adequately pled an ongoing "major federal

5

action" that would require Federal Defendants to prepare a supplemental EIS. The Court stayed its dismissal of the  ninth, tenth, eleventh, twelfth, and thirteenth claims for relief, all regarding the California unfair business practices laws, pending a California Supreme Court ruling on whether Proposition 64 applies retroactively.

Plaintiffs filed a second amended complaint ("SAC") which repled all claims for relief, including those dismissed with prejudice, and added a fourteenth claim for unlawful business practices.[1]  Federal Defendants subsequently moved for dismissal/summary judgment on the second and seventh Claims for Relief.  That motion is pending before the Court.

After the Service issued its 2005 BiOp, plaintiffs amended their complaint to add a fifteenth claim for relief under the Administrative Procedures Act ("APA") alleging that the 2005 BiOp's "no jeopardy" determination was arbitrary and capricious.  Plaintiffs also moved for a preliminary injunction under the fifteenth and second claims to enjoin PALCO's logging activities.  This motion, too, is pending before the Court.

### HOLDING

After evaluating all the briefs and the administrative record, and having the benefit of oral argument, the Court GRANTS Federal Defendants' motion for summary judgment on the second and seventh claims for relief, and DENIES plaintiffs' motion for a preliminary injunction.

### DISCUSSION

### I.    Motion to Dismiss/for Summary Judgment on NEPA claim

Federal Defendants move to dismiss the NEPA claim (second claim for relief) on the ground that the complaint does not allege any proposed or ongoing "major federal activity" which would trigger a duty to prepare a supplemental EIS.  Plaintiffs respond that major federal actions still exist:  (1) under the management regime prescribed by the Conservation

---

[1]Plaintiffs explain that they reasserted the dismissed claims "as a precautionary measure to ensure against any misconception that Plaintiffs have abandoned these claims for purposes of appeal." See Pl.'s Resp. to Mot. to Dismiss Second Am. Compl. at 1. At oral argument they also confirmed that the sixth claim for relief is no longer viable.

United States District Court

For the Northern District of California

1  Plan/Take Permit/Implementation Agreement, sometimes referred to as "adaptive

2  management;" and (2) as a result of changes the 2005 BiOp made to the Conservation

3  Plan/Take Permit.

4      **A.    Legal Requirements for a Supplemental EIS**

5      "NEPA mandates that federal agencies prepare an EIS *for major federal actions*

6  'significantly affecting the quality of the human environment.' 42 U.S.C. § 4332(2)(C)."

7  Cold Mountain v. Garber, 375 F.3d 884, 892 (9th Cir. 2004) (emphasis added); see also

8  Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, 124 S.Ct. 2373, 2384 (2004)

9  ("NEPA requires a federal agency to prepare an environmental impact statement (EIS) as

10  part of any 'proposals for legislation and other major Federal actions significantly affecting

11  the quality of the human environment.'").  "NEPA also imposed on federal agencies an

12  ongoing duty to issue supplemental environmental analyses."  Cold Mountain, 375 F.3d at

13  892.  Supplementation is required where "'[t]here are significant new circumstances or

14  information relevant to environmental concerns and bearing on the proposed action or its

15  impacts.'"  Southern Utah Wilderness Alliance, 542 U.S. at __, 124 S.Ct. at 2384 (citation

16  omitted) ("SUWA").

17      The federal regulations implementing NEPA define the level of federal involvement

18  necessary to require an EIS as follows:

19      "Major Federal action" includes actions with effects that may be major and
20      which are potentially subject to Federal control and responsibility.... [Actions
21      include] [a]pproval of specific projects, such as construction or management
22      activities located in a defined geographic area. Projects include actions
23      approved by permit or other regulatory decision as well as federal and federally
24      assisted activities.

24  40 C.F.R. 1508.18.

25      **B.    Adaptive Management**

26      Plaintiffs allege that the "adaptive management" set forth in the Conservation

27  Plan/Take Permit/Implementation Agreement create four ongoing obligations of Federal

28  Defendants that constitute "major federal action" under NEPA.  Federal Defendants must:

7

**United States District Court**

For the Northern District of California

a.   Review, consult, and approve, deny or direct modifications of all activities that are proposed near occupied murrelet stands to ensure that the disturbance of the murrelets is minimized and decide whether to "release" or retain certain old-growth areas for logging (SAC ¶ 139);

b.   Implement, monitor and assess compliance with the Conservation Plan (Id. at ¶ 140);

c.   Approve or disapprove a schedule that results in completion of the Watershed Analysis process for all covered lands within five years of issuance of the Take Permit, including approving which areas will be analyzed and reviewing the Analyses every five years (Id. at ¶ 141);

d.   Provide "oversight and decisionmaking authority" over sediment control, including potentially allowing or denying road construction (Id. at ¶ 142).

Plaintiffs urge that these obligations create "discrete decision points, requiring the agency to choose between alternative means of accomplishing [its goals]." Pl.'s Resp. to Mot. to Dismiss SAC at 5.   Defendants move to dismiss on the ground that these responsibilities do not constitute "major federal action" as a matter of law.

In Cold Mountain, the Forest Service issued a take permit with certain restrictions, such as helicopter hazing restrictions; thus, the take permit arguably required the Forest Service's oversight.   The Ninth Circuit nonetheless held "that there is no ongoing 'major Federal action' requiring supplementation. . . . Because the Permit has been approved and issued, the Forest Service's obligation under NEPA has been fulfilled."   375 F.3d at 894. Similarly, in SUWA, a land use plan adopted by the Bureau of Land Management provided that a certain area's off-road vehicle use would be closely monitored, and the area closed to such traffic if warranted.   Again, the plan required on-going federal monitoring and perhaps even action.   The Supreme Court nonetheless held that the monitoring did not constitute on-going major federal action:

[A]lthough the "*[a]pproval* of a [land use plan]" is a "major Federal action" requiring an EIS, that action is completed when the plan is approved. The land use plan is the "proposed action" contemplated by the regulation. There is no ongoing "major Federal action" that could require supplementation (though BLM *is* required to perform additional NEPA analyses if a plan is amended or revised, see §§ 1610.5-5, 5-6).

124 S.Ct. at 2385 (internal citations omitted).

Under Cold Mountain and SUWA Federal Defendants' ongoing monitoring of PALCO's compliance with the Conservation Plan/Take Permit does not constitute major federal action. Plaintiffs point out, however, that here Federal Defendants must do more: the Conservation Plan/Take Permit/Implementation Agreement involve the Federal Defendants in an "ongoing program of discretionary decisionmaking" to determine "when, where, and how" activities on PALCO's land will proceed. Pl.'s Resp. to Mot. to Dismiss SAC at 8.

Plaintiffs rely primarily on Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 109 S.Ct. 1851 (1989). In that case, the Army Corp of Engineers proposed to build a dam and in connection with the project prepared an EIS. After the project was one third complete, the plaintiffs challenged the Corp's failure to prepare a supplemental EIS based on new information about the dam's effect on fish. The Supreme Court and the parties assumed that the construction of the dam constituted ongoing major federal action that could require EIS supplementation. See Marsh, 490 U.S. at 370-374.

Here, in contrast to Marsh, Federal Defendants are not building anything or even harvesting the trees. The major federal action that required the EIS in the first place was the adoption of the Conservation Plan and issuance of the Take Permit, and those actions are complete. All that remains is Federal Defendants' "adaptive management" under the Conservation Plan/Take Permit/Implementation Agreement.

This case falls somewhere between Cold Mountain/SUWA and Marsh. While "adaptive management" requires more federal action than the land use plan in SUWA or the

9

regulatory oversight in <u>Cold Mountain</u>, "adaptive management" is not as "major" as building a dam.  The Court is not persuaded that Congress intended "major federal action" as used in NEPA to include Federal Defendants' adaptive management under the Conservation Plan/Take Permit.

First, plaintiffs have not cited any case, and the Court is aware of none, in which a federal agency's similar management activities were held to constitute "major federal action."

Second, if the Court were to hold that such oversight does constitute major federal action, such a holding might encourage the Service to abandon adaptive management all together in favor of issuing a take permit without any conditions that require the Service to make any further decisions.  As a unanimous Supreme Court observed in <u>SUWA</u>, while a judicial decree ordering the Bureau of Land Management to comply with its land use plan "might please the environmental plaintiffs in the present case, it would ultimately operate to the detriment of sound environmental management.  Its predictable consequence would be much vaguer plans from BLM in the future–making coordination with the other agencies more difficult, and depriving the public of important information concerning the agency's long-range intentions."  124 S.Ct. at 2384.  Similarly, an order that the "adaptive management" at issue here is a major federal action might please plaintiffs here, but it could doom the use of such hands-on management in the future.  While Congress might decide that a supplemental EIS is nonetheless prudent, in the Court's view it has not yet done so.

Plaintiffs also argue that the Service's preparation of the 2005 BiOp pursuant to ESA section 7 means that the Service considers its ongoing responsibilities to constitute "major federal action" under NEPA.  The Ninth Circuit disagrees.  ESA section 7 requires a federal agency to engage in consultation to "insure that *any action authorized, funded, or carried out by* [a federal agency] . . . is not likely to jeopardize the continued existence of any

endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined . . . to be critical." 16 U.S.C. § 1536(a)(2) (emphasis added). NEPA, in contrast, requires an EIS only for *major federal actions* significantly affecting the quality of the human environment. See 42 U.S.C. § 4332(2)(C) (emphasis added). While the standards are somewhat similar, the distinction in their wording demonstrates that the NEPA requirement for an EIS is "more exclusive," that is, more narrow, than ESA section 7. Marbled Murrelet v. Babbitt, 83 F.3d 1068, 1075 (9th Cir. 1996).

Federal Defendants' adaptive management approach was the "agency action . . . carried out" by a federal agency that required reinitiation of consultation under ESA section 7. While such conduct satisfies ESA section 7, as is explained above, it does not rise to the level of "major federal action;" therefore, the Service may reinitiate section 7 consultation and not necessarily trigger a requirement for a supplemental EIS.

**C.    Modifications to the Take Permit Under the 2005 BiOp**

In SUWA, the Supreme Court held that Bureau of Land Management's ongoing administration of the land use plan was not "major federal action" under NEPA; nonetheless, the Court recognized that if the land use plan is amended or revised then supplementation *is* required (assuming the other requirements for supplementation are met). 124 S.Ct. at 2385.

Both parties agree that if the 2005 BiOp made certain changes to the Conservation Plan/Take Permit then the 2005 BiOp would constitute major federal action under NEPA. See Pl.'s Reply at 9; Fed. Def.'s Response at 18; Ramsey v. Kantor, 96 F.3d 434, 443-444. The parties disagree, however, as to whether the 2005 BiOp did in fact change the Conservation Plan/Take Permit such that Federal Defendants are required to supplement the EIS.

11

**United States District Court**

For the Northern District of California

Plaintiffs argue that the reinitiation of consultation resulted in "changes being made to the underlying action" and "address[ed] new information," thus requiring supplementation. Pl.'s Reply at 9.  Plaintiffs cite the increased amount of murrelet habitat recognized in the 2005 BiOp as the change to the Take Permit necessitating a supplemental EIS.  Id.

Plaintiffs' argument is unpersuasive.  The 2005 BiOp did recognize a higher occupancy rate for Douglas fir stands, thus increasing the amount of likely occupied murrelet habitat on both PALCO lands and in the adjoining Humboldt Redwood State Park; yet, this change did not alter Federal Defendants' or PALCO's responsibilities under the Conservation Plan, nor create a new standard dictating when Federal Defendants must act.  See Westlands Water Dist. v. U.S. Dept. of Interior, 275 F.Supp.2d 1157, 1195 (E.D. Cal. 2002).

Since, as a matter of law, no major federal action remains as a result of the Conservation Plan/Take Permit/Implementation Agreement or 2005 BiOp,[2] Federal Defendants' motion for summary judgment is GRANTED on the second claim for relief.

## II.      Motion to Dismiss/for Summary Judgment on Seventh Claim for Relief

Plaintiffs also allege that the Secretary of the Service ("Secretary") has a "duty to revoke" the Take Permit based on "at least 325 violations of the California Forest Practices Rules and [PALCO's] HCP in the last five years."  See Pl.'s Resp. to Def.'s Mot. to Dismiss SAC. at 10-11; SAC at ¶ 113.  Plaintiffs base their allegation on the language at ESA section 10, which states: "The Secretary *shall* revoke a permit issued under [the Take Permit provisions] if he finds that the permittee is not complying with the terms and conditions of the permit."  Id. at 10 (emphasis added) (citing 16 U.S.C. § 1539(a)(2)(C)).  Plaintiffs may not seek permit enforcement directly under ESA, but may seek judicial review of the

---

[2]Since this court does not find a major federal action, the "new information" prong of the supplemental EIS analysis will not be considered.

12

Secretary's alleged failure to revoke the Take Permit under APA.  See 5 U.S.C. §§ 701-706; Atlantic Green Sea Turtle v. County Council of Volusia County, 2005 WL 1227305 at *15 (M.D. Fla. May 2, 2005).

## A.    Legal Standard for Judicial Review of Agency Non-Enforcement

The APA broadly allows judicial review of "agency actions" by any person "adversely affected or aggrieved" by the action.  Heckler v. Chaney, 470 U.S. 821, 828 (1985) (citing § 702).  A failure to act is also entitled to judicial review as long as the action is a "final agency action for which there is no other adequate remedy in a court."  Id. (citing § 704).  Any review, however, is prohibited if the action or inaction falls within the exceptions of section 701(a), including "agency action[s] . . . committed to agency discretion by law."  Id. (citing § 701(a)(2)).

In general, refusals of an agency to take an enforcement action are presumed committed to an agency's absolute discretion and thus are not judicially reviewable.  See id. at 831.  The presumption may be rebutted "where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers."  Id. at 832-33 (internal footnote omitted).[3]  In order for the court to find "law to apply," Congress must have expressed an intent to circumscribe agency enforcement discretion and have provided "meaningful standards for defining the limits of that discretion."  Id. at 834.

In Heckler, the Supreme Court gave three reasons for the presumption against reviewability of non-enforcement actions:  (1) agency decisions about whether to enforce

---

[3]In Heckler, the Court reserved judgment for situations where the agency has "consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities."  Id. at 833 fn. 4 (internal quotations omitted) (citing Adams v. Richardson, 480 F.2d 1159 (U.S.App.D.C. 1973)).  Plaintiffs do not assert that Federal Defendants have consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities.

United States District Court

For the Northern District of California

often fall within the peculiar expertise of the agency; (2) non-enforcement typically does not involve the agency exercising coercive power over an individual's liberty or property rights; and (3) non-enforcement bears resemblance to a prosecutor's decision not to indict--a decision "long regarded as in the special province of the Executive Branch." Id. at 831-32.

The Ninth Circuit has not addressed the reviewability of the non-enforcement of ESA section 10, although it has generally upheld the presumption of unreviewability in other non-enforcement actions.  See, e.g., Friends of the Cowlitz v. F.E.R.C., 253 F.3d 1161, 1171-73 (9th Cir. 2000) (holding the Federal Energy Regulatory Commission's decision not to investigate alleged violations of the Federal Power Act--which states the "Commission shall monitor and investigate" license compliance and "may issue such orders as necessary to require compliance with the terms and conditions of the licenses"–was within the agency's discretion and therefore not reviewable);  State of Cal. v. United States, 104 F.3d 1086, 1093-95 (9th Cir. 1997) (holding non-reviewable the Attorney General's failure to enforce statutory obligation requiring that she "shall begin any deportation proceeding as expeditiously as possible" after the date of conviction of an alien).

**B.    Analysis**

ESA section 10 provides that "[t]he Secretary shall revoke a permit issued under [the Take Permit provisions] if he finds that the permittee is not complying with the terms and conditions of the permit."  § 1539(a)(2)(C).  The implementing regulations are permissive: they provide that "[a] permit *may* be revoked" for any of five reasons including violations of the law that involve "a violation of the conditions of the permit."  50 C.F.R. § 13.28(a)(1) (emphasis added).  Further, some or all of the privileges under the permit "*may* be suspended at any time if the permittee is not in compliance with the conditions of the permit, or with any applicable laws or regulations governing the conduct of the permitted activity."  50 C.F.R. § 13.27(a) (emphasis added).

United States District Court

For the Northern District of California

14

In <u>Atlantic Green Sea Turtle</u>, the Middle District of Florida, applying <u>Heckler</u>, held that Congress committed ESA section 10 enforcement to absolute agency discretion and therefore non-enforcement is unreviewable.  2005 WL 1227305 at *15-16.  The court reasoned that the language of the statute requires a discretionary "finding" that a permittee is in non-compliance with the permit before the statute mandates the Secretary to revoke the permit.  <u>Id.</u> at *16.  The court explained:

> The ESA does not provide any judicially manageable standard to constrain the Service's deliberative, investigative discretion. Absent such constraints in the ESA, when addressing the uncountable instances of possible noncompliance, the Service presumptively has unreviewable discretion, in various and sundry instances, not to undertake steps for finding noncompliance.  Under the APA, the Court cannot compel such steps because the ESA provides no standards to judge whether they have been unlawfully withheld, *see* 5 U.S.C. § 706(1); and, alternatively, the Court cannot hold unlawful and set aside a refusal in that regard as an abuse of discretion because the ESA provides no standard by which to judge such basic investigative and deliberative decisions, *see id.* § 706(2).

<u>Id.</u>

The Court finds the reasoning of <u>Atlantic Green Sea Turtle</u> persuasive: a "finding" of non-compliance is within Federal Defendants' discretion and not reviewable by this Court. The language of section 10 includes the permissive, "*if* he finds that the permittee is not complying with the terms and conditions of the permit," similar to the permissive language of the FDCA reviewed in <u>Heckler</u>.  <u>Heckler</u>, 470 U.S. at 835 (the Secretary is "authorized to conduct examinations and investigations" and any person who violates the Act, "shall be imprisoned . . . or fined.").  Further, the Secretary retains discretion, under the implementing regulations, to either suspend *or* revoke the permit, or do neither, if the Secretary finds permit violations.  <u>See</u> §§ 13.27(a); 13.28(a)(1).  Such discretionary latitude does not provide this Court with law to apply.

15

United States District Court

For the Northern District of California

ESA section 10 also invokes the three policy considerations adduced in Heckler. First, Federal Defendants are in the best position to determine how and when to make findings of non-compliance with permit conditions. Such decisions involve weighing factors such as agency resources and overall compliance with the intricately planned Conservation Plan/Take Permit/Implementation Agreement procedures. Second, by not finding PALCO in violation of the Take Permit and thus not revoking the Take Permit, Federal Defendants do not exercise coercive power over an individual's liberty or property rights and so the courts should be more hesitant to interfere. Finally, Federal Defendants discretion not to enforce ESA section 10 may be analogized to the prosecutorial discretion afforded the Executive Branch.

Plaintiffs assert, although not in so many words, that the Implementation Agreement provides courts with law to apply by requiring the Conservation Plan Monitor to make findings for Federal Defendants. Pl.'s Resp. to Def.'s Mot. to Dismiss SAC. at 11. Plaintiffs cite language of the Agreement requiring the Monitor to "immediately report to [Federal Defendants]...any deviations by [PALCO] from the conservation and management measures provided for under the [Conversation Plan's] Operating Conservation Program, so that [Federal Defendants] . . . may take appropriate action to enforce the Federal Permit . . . ." Id. This argument is unpersuasive. First, the language of the Agreement is phrased in the permissive: it provides that Federal Defendants *may* take appropriate action to enforce the Take Permit. Second, the Agreement only provides that the Monitor will report deviations from the Conservation Plan and does not outline procedures for the Monitor to make findings; indeed, the Implementation Agreement contemplates that Federal Defendants will take "appropriate action," implying that Federal Defendants still have the discretion to find a violation or not. Therefore, the Implementation Agreement does not provide law to apply in determining whether Federal Defendants have made a "finding," even assuming such an Agreement may be a source of the "law to apply" under Heckler.

16

**United States District Court**

For the Northern District of California

Plaintiffs also urge that Federal Defendants have "found" violations of the Take Permit, invoking their non-discretionary duty to revoke the ITP. They contend that the Monitor is the "party designated to undertake the [finding] responsibility pursuant to the" Conservation Plan/Take Permit/Implementation Agreement, and since the Monitor has reported hundreds of past violations, Federal Defendants have found violations for purposes of ESA section 10. Id. As is explained above, the Implementation Agreement does not confer "finding authority" to the Monitor. Federal Defendants retain non-reviewable discretion to "find" violations of the Take Permit.

Finally, plaintiffs maintain that their claim should survive the motion for summary judgment because, taken in the light most favorable to them, plaintiffs have asserted "ample factual support for their allegation that the Federal Defendants have actual knowledge of widespread violations of the [Conservation Plan/Take Permit] and have failed to carry out their permit revocation duty." Id. at 13. The Court's inquiry under the APA, however, is whether there is law to apply. Neither the ESA, the implementing regulations, nor the Implementation Agreement provide the Court with a framework for determining whether Federal Defendants have "found" permit violations that require the revocation of a take permit. Therefore, such determinations are within the discretion of the agency and unreviewable by this Court, regardless of what information may be discovered in future proceedings. Plaintiffs' seventh claim for relief therefore fails as a matter of law.

**III.    Motion for Preliminary Injunction**

    **A.    Standard for Injunctive Relief**

The traditional criteria for granting preliminary relief are: (1) a likelihood of success on the merits, (2) the possibility of irreparable injury, (3) a balance of hardships favoring the plaintiff, and (4) that the preliminary relief be in the public interest. See Barahona-Gomez v. Reno, 167 F.3d 1228, 1234 (9th Cir. 1999). This test has evolved into the modern test that

17

United States District Court

For the Northern District of California

the plaintiff must "demonstrate either (1) a combination of probable success on the merits and the possibility of irreparable injury if relief is not granted, or (2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in its favor." First Brands Corp. v. Fred Meyer, Inc., 809 F.2d 1378, 1381 (9th Cir. 1987).  For ESA purposes, Congress has determined that the balance of hardships and the public interest tip heavily in favor of endangered species.  See Sierra Club v. Marsh, 816 F.2d 1376, 1383 (9th Cir. 1987) (citing TVA v. Hill, 437 U.S. 153, 187-88, 194-95 (1978)).

**B.     The Merits**

Plaintiffs assert two grounds for a preliminary injunction:  (1) the Service's 2005 BiOp "reaches arbitrary and capricious conclusions which bear no rational connection to the facts before the agency" in violation of the ESA, as alleged in the fifteenth claim for relief; and (2) Federal Defendants have failed to supplement the EIS in violation of NEPA, as alleged in the second claim for relief.  Since this Court has determined that, as a matter of law, NEPA supplementation is not required, only the 2005 BiOp is at issue.

**1.     Standard of Review**

Under the APA an agency decision may be overturned only where it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  See Selkirk Conservation Alliance v. Forsgren, 336 F.3d 944, 953 (9th Cir. 2003) (citing 5 U.S.C. § 706(2)(A)).  The Court cannot substitute its judgment for that of the Service, but instead must uphold its decision so long as the agency has "considered the relevant factors and articulated a rational connection between the facts found and the choice made." Id. at 953-54 (citing Washington Crab Producers, Inc. v. Mosbacher, 924 F.2d 1438, 1441 (9th Cir.1990)).

An agency decision is arbitrary and capricious "if the agency has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the

evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Defenders of Wildlife v. EPA, 420 F.3d 946, 959 (9th Cir. 2005)(citing Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29, 42-43 (1983)).  Furthermore, agency decisions may not be inconsistent with the governing statute, id. (citing 5 U.S.C. § 706(2)(A)), and "internally contradictory agency reasoning renders resulting action arbitrary and capricious; such actions are not 'founded on a reasoned evaluation of the relevant factors.'" Id.  (quoting Ariz. Cattle Growers' Ass'n v. U.S. Fish and Wildlife, 273 F.3d 1229, 1236 (9th Cir. 2001)).

In the 2005 BiOp the Service reviewed the new information and concluded that the logging activities authorized under the Conservation Plan/Take Permit are not likely to jeopardize the continued existence of the marbled murrelet or result in the destruction or adverse modification of marbled murrelet habitat deemed critical.  To prevail on their motion for a preliminary injunction, plaintiffs must show that there are serious questions as to whether the Service's determination was arbitrary and capricious.

### 2.    Whether Serious Questions Exist

Plaintiffs allege four deficiencies that render the 2005 BiOp arbitrary and capricious. They contend that the 2005 BiOp:  (1) neglects the impacts of oil spills; (2) fails to respond to a declining murrelet population and the McShane Report's population model; (3) neglects the impacts of logging additional occupied murrelet habitat; and (4) neglects the impacts of PALCO's Conservation Plan/Take Permit violations.

### a.    Impacts of Oil Spills

Three oil spills occurred along the Pacific Coast between 1997 and 1999 that had an impact on the existence of marbled murrelets--the Kure spill in Humboldt Bay in 1997 ("Kure Spill"); the Stuyvesant spill in Humboldt Bay in 1999 ("Stuyvesant Spill"); and the New Carissa spill in Coos Bay, Oregon in 1999 ("New Carissa Spill").  In the context of the

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Conservation Plan, the Kure Spill and Stuyvesant Spill occurred off the coast of Zone 4 and the New Carissa Spill occurred off the coast of Zone 3.[4]  See 2005 BiOp at 8-9.  All parties admit that the oil spills caused the known direct deaths of certain murrelets (dead murrelets actually discovered), projected or assumed deaths (dead murrelets not actually discovered, but assumed to have been killed by the spill), and sub-lethal effects on the species.  See Pl.'s Mot. at 10-12; 2005 BiOp at 9.

The Conservation Plan addresses oil spills under the section pertaining to "unforeseen changes" and determines that the potential for small spills--up to 77 gallons--is likely within the Humboldt Bay.  Conservation Plan at P-135.  According to the Plan, small spills, even as frequent as 150 in a seven year period, do not result in substantial adverse change.  Id.  Larger spills, however, such as the Kure Spill that released 4,500 gallons, "cause more significant effects."  Id.  At the time the Plan was created, estimates of assumed murrelet deaths due to the Kure Spill had not been calculated, but were assumed to be "several times higher than" the nine dead murrelets discovered.  Id.  Thus, the Conservation Plan considers, albeit roughly, a number of dead murrelets several times higher than nine, as the yardstick for determining impact on the species.  The deaths due to Stuyvesant Spill and New Carissa Spill occurred after the issuance of the Plan.

The 1999 BiOp addresses oil spills only glancingly, indicating that oil spills are a "known threat."  See 1999 BiOp at 78.

Based on information compiled between 1999 and 2002, the April 2002 Memo addressed the effects of the Stuyvesant and Kure Spills to determine whether, based on the "No Surprises Rule" and "unforeseen circumstances" definition detailed in the Conservation

---

[4]The "listed range" of the species is divided into six "Marbled Murrelet Conservation Zones," alternatively referred to as "MMCZs" or "Zones."  The Murrelet Recovery Plan indicates that "maintaining a well-dispersed population is necessary for the long-term survival and recovery of the [marbled murrelet]."  Pl.'s Mot. at 13.  PALCO lands exist within Zone 4.

20

United States District Court

For the Northern District of California

Plan, additional conservation measures were required under the Plan.  See 50 C.F.R. §
17.32(b)(5)(iii); April 2002 Memo at 7.  The April 2002 Memo determined the Spills created
"unforseen circumstances," triggering additional conservation measures.  Id. at 1.
Specifically, the April 2002 Memo determined that the marbled murrelet's "baseline
condition is much less favorable than was believed at the time of the permit issuance," in part
because the "impacts on marbled murrelets was much larger than assumed in the PALCO
[Conservation Plan], potentially enough to put the Kure mortality alone in the range of an
unforeseen circumstance."  Id. at 1, 7.  Taken in conjunction with the Stuyvesant Spill, both
spills, the Memo determined, occurring within a short time frame, "particularly within the
same time frame as the majority of the impact from harvest of habitat was anticipated to
occur, and within the [Zone] that is offshore of the covered PALCO lands," appear to clearly
exceed what the Conservation Plan anticipated.  Id.  In total, the biologist that authored the
April 2002 Memo believed the Kure and Stuyvesant Spills caused a 10 percent reduction to
the Zone 4 population, creating a significantly adverse effect on the marbled murrelet.  Id.

In response to the April 2002 Memo, a Service supervisor issued the October 2002
Memo disagreeing with the biologist's conclusion that the Kure Spill and/or Stuyvesant Spill
created an "unforeseen circumstance:" (1) "the occurrence of oil spills on the Pacific Coast is
an event that we can reasonably anticipate during the 50-year term of the HCP"; and (2)
"only a fraction of a percent of the murrelets in [Zone 4], or within the listed range of the
species, would be affected by the application of additional conservation measures on
[Conservation Plan] lands," a factor detailed in the No Surprises Rule.  See Oct. Mem. at 2-4;
50 C.F.R. § 17.32(b)(5)(iii)(6).  The supervisor cited the "well-known history" of oil spills,
as well as the fact that the Kure Spill occurred prior to the issuance of the Conservation Plan,
as reasons that the spills had been anticipated and that future spills of that magnitude were
also anticipated in the Plan.  Oct. Mem. at 2.

United States District Court

For the Northern District of California

The 2005 BiOp acknowledges the murrelet deaths from the three oil spills, and recounts the Service's findings in the October 2002 memo.  Citing the 1999 BiOp, the 2005 BiOp concludes that, "based on the population estimates provided by at-sea surveys, the current estimate of murrelets within [Zone 4] is within the range expected in the 1999 [BiOp] with up to 7 percent annual decline within [Zone 4] and throughout the species listed range." 2005 BiOp at 18;  see also 1999 BiOp at 81.  Thus, "the reduction in the breeding population that likely resulted from the spills is still within the overall range of decline anticipated and analyzed in the 1999 [BiOp]."  2005 BiOp at 18.

                i.          Whether the 2005 BiOp underestimated the impact of oil spills on murrelet populations

Plaintiffs argue that in light of the Conservation Plan's failure to anticipate the magnitude of the harm from the Kure Spill, the short time period between the three spills, and the assumed loss of 543 murrelets from the combined spills, the 2005 BiOp, in "rubberstamping" the 1999 BiOp, arbitrarily and capriciously dismisses the effects of oil spills on the survival of the murrelet.[5]

While plaintiffs have demonstrated that the Conservation Plan and 1999 BiOp did not anticipate the extent of murrelet deaths caused by the Kure Spill (151 is more than "several times more than" nine), they have not shown that the 2005 BiOp's conclusion--that, in light of the assumed impact of all three oil spills, PALCO's logging activities still do not jeopardize the species--was arbitrary and capricious.  The 1999 BiOp assumed the murrelet population would decline four to seven percent per year, and in the 2005 BiOp the Service provides statistical support for its conclusion that "the reduction in the breeding population

---

[5]Plaintiffs also contend that the number of murrelets killed by the three oil spills is "more than the [Conservation Plan's] estimated loss of murrelets throughout the entire 50 year duration of the [Plan]."  Pl.'s Mot. at 11. Plaintiffs do not cite any part of the Conservation Plan that predicts the  number of murrelets that will be killed under the Plan over the 50 years; instead, plaintiffs merely cite to a portion of their expert's declaration.

22

that likely resulted form the spills is still within the overall range of decline anticipated and analyzed in the 1999 [BiOp]." 2005 BiOp at 5-8. It also explains that, despite the oil spills, the high quality habitat protected under the Conservation Plan "remains protected and available to provide nesting opportunities for the birds that survived the spill." Id. at 18. In particular, the 2005 BiOp notes that in the October 2002 Memo the Service "examined the efficacy of implementing additional conservation measures on PALCO lands and concluded that since the vast majority of higher murrelet habitat covered by the PALCO [Conservation Plan] is already protected . . ., restricting logging on the remaining acres of lower quality murrelet habitat available for harvest under the [Plan] would not appreciably affect the likelihood of the survival and recovery of the marbled murrelet in Conservation Zone 4 . . . ." Id. at 9.

In light of this record, plaintiffs have not raised a serious question as to the Service's determination that the new oil spill information does not reveal that PALCO's logging activities will affect the murrelet to an extent that the Service had not previously considered.

ii.     The "best science available"

Plaintiffs also argue that the Service did not use the "best science available;" plaintiffs suggest that the opinions of their expert, Harold Carter, provide the best science available. In evaluating this argument, the Court must bear in mind the words of the Marsh Court: "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." Marsh, 490 U.S. at 385.

Plaintiffs first assert that the Service acted arbitrarily by mentioning, but not accounting for, the sub-lethal effects of oil spills on the murrelet population. Pl.'s Mot. at 12 fn. 4. The 2005 BiOp acknowledges that oil spills cause sub-lethal effects, yet "information on potential sub-lethal effects is not available and has not been quantified for these spills."

23

2005 BiOp at 9.  Plaintiffs cite to their expert's opinion that sub-lethal effects include lost future reproduction, reduced breeding for 1-2 years and no future breeding due to mate or site loss.  Pl.'s Mot. at 12 fn. 4; Carter Decl. at ¶ 16.  The expert, however, does not identify any information or studies, that is, the "best science available," that suggest that sub-lethal effects alone or in combination with directly lethal effects of the oil spills create a threat to the survival of the species.

Plaintiffs also challenge the Service's determination that conservation of high quality habitat will maintain a viable population.  Pl.'s Mot. at 12.  Plaintiffs suggest, again, that the best science available is the opinion of their expert, Mr. Carter.  Again, as this argument simply reflects a difference of opinion between experts, the Court must defer to the Service.

> b.   *Methodology for Determining Population and Percentage of Decline*

As stated above, the 1999 BiOp anticipates a decline in murrelet population of four to seven percent annually.  See 1999 BiOp at 81.  The "rates of decline from the [McShane model] are generally consistent with earlier models that forecast declines of 4-7%." Pl.'s Exh. A (McShane Report at 3-58).  Unlike the 1999 BiOp, however, the McShane Report concludes that for Zone 4 there is a 50 percent likelihood of extinction within the next 60 years.  2005 BiOp at 10.

The 2005 BiOp eschews the McShane Report' extinction prediction as "too unreliable."  2005 BiOp at 10.  "Inasmuch as we cannot determine current population size with a reasonable degree of certainty, it is unrealistic to expect that population projections and extinction probabilities reaching 40 to 100 years into the future are accurate and reliable."  Id.  The 2005 BiOp explains that the methodology is too unreliable because the model: assumes no change in "vital rates" over the next forty years; assumes "breeding

United States District Court

For the Northern District of California

1   success" will remain constant over forty years; does not account for increased habitat

2   suitability; and does not use "increasing rates of fecundity."  BiOp at 10-11.

3       Plaintiffs first argue that the Service ignores the significance of the declining murrelet

4   population and, specifically, that the Service's conclusion that five more years of data is

5   necessary to determine whether the murrelet population is declining is arbitrary and

6   capricious.  The 2005 BiOp and the 1999 BiOp, however, both anticipate an annual decline

7   in the murrelet population of four to seven percent, and the McShane Report, upon which

8   plaintiffs rely, does not estimate declines greater than those in the 2005 BiOp.  Without data

9   indicating that Zone 4 murrelet populations are declining at a rate greater than 4 to 7 percent,

10  plaintiffs' challenge to the Service's 2005 BiOp determination regarding the rate of decline

11  must fail.

12      Next, plaintiffs argue that the Service's refusal to adopt the McShane methodology for

13  determining population size (and thus its conclusion of likely extinction in the next 40 to 100

14  years) was arbitrary and capricious.  The Service did not rely on the McShane model because

15  of its uncertainty, "especially when applied at the smaller conservation zone scale of

16  modeling."  2005 BiOp at 10.  It also noted that "[i]nasmuch as we cannot determine current

17  population size with a reasonable degree of certainty, it is unrealistic to expect that

18  population projections and extinction probabilities reaching 40 to 100 years into the future

19  are accurate and reliable."  Id.  The Service observed that the McShane Report failed to take

20  into account that in the next 40 years maturing second-growth trees protected from

21  harvesting will result in improved murrelet nesting success, and that its model does not

22  utilize increasing rates of fecundity.  Id. at 10-11.  "The Service believes that fecundity may

23  very well increase in the future, because the strategy employed in the Northwest Forest Plan

24  and in the PALCO [Conservation Plan] is to conserve the highest quality nesting habitats and

25  confine losses to unsuitable and lower quality suitable habitat."  Id. at 11.

26

27

28

United States District Court

For the Northern District of California

Plaintiffs seize on the BiOp's statement about increased fecundity.[6]   They argue that the Service could not have rationally concluded that fecundity "may very well increase" in the future in light of facts acknowledged by the Service: the murrelet is experiencing poor breeding success (2005 BiOp at 12-13); fifty percent of all active nest sites have failed due to predation (Id. at 12); murrelets only produce one egg per year (57 Fed. Reg. 45,329); and tree growth for creating suitable habitat requires hundreds of years (2005 BiOp at 11).

Even if the Service's statement about the likelihood of increased fecundity was not rational, however, the statement was not dispositive of the Service's rejection of the McShane model.  As is explained above, the 2005 BiOp gave several reasons why the McShane Report's extinction projections were not reliable, including because they are so far out in time and do not incorporate the expected increase in habitat suitability.  Indeed, as the 2005 BiOp noted, the McShane Report itself acknowledges that "'. . . by the end of 40 years, many population conditions and parameter values will have changed, making longer-term projection of population trends much less reliable.'"  2005 BiOp at 11 (citing McShane at 3-33).  Thus, the Service's refusal to adopt the McShane Report's long-term extinction projection was not arbitrary and capricious.

Finally, plaintiffs challenge the Service's conclusion that the logging of PALCO's lands will not jeopardize the murrelet because of the large protected areas set aside in the PALCO Conservation Plan.  Again, citing their expert's testimony, plaintiffs contend that it is unacceptable for the Service to permit PALCO to harvest its forests until surveys have been conducted that confirm that murrelets are actually using the forests that have been set aside.  Pl.'s Mot. at 16.  That plaintiffs' expert disagrees with the Service, however, does not

---

[6]The Service and PALCO use different definitions of fecundity.  PALCO asserts that increased fecundity means "more eggs."  See PALCO's Opp. to P.I. at 21.  The Service rejects this definition and suggests that increased fecundity means a greater rate of successfully hatched female fledglings per adult breeding female.  See Fed. Defs' Opp. to P.I. at 14.  In their reply, plaintiffs embrace the Service's definition, as does the Court.

make the Service's determination arbitrary and capricious. See Marsh, 490 U.S. at 385.

> c.   *Additional Occupied Murrelet Habitat*

Plaintiffs next argue that the 2005 BiOp arbitrarily dismissed new information regarding the amount of suitable murrelet habitat that will be lost by PALCO's logging.

The 1999 BiOp quantifies the acreage of potentially suitable murrelet habitat at various "scales," including, from smallest to largest: PALCO lands, SH bioregion, Zone 4, California, and across California, Oregon and Washington. See 1999 BiOp at 82-85. Each smaller scale is entirely contained within the next largest scale, such that PALCO lands are entirely within the SH bioregion, which is entirely within Zone 4, which exists within California, Oregon, and Washington.[7] See 1999 BiOp, Table 13 at 85. Because the lands had not been adequately surveyed at the time, the 1999 BiOp determined the total acreage of potentially suitable murrelet habitat by classifying the lands according to the likelihood of murrelet occupancy and multiplying those acres by an "occupancy rate." See 2005 BiOp at 16. The 1999 BiOp assumed an "occupancy rate" of five percent for lands designated as "unsurveyed Douglas fir stands." See 1999 BiOp at 83. Based on those findings, the 1999 BiOp concluded that PALCO's logging would result in the take of an "unquantified number of murrelets associated with the removal of 4,696 acres of occupied habitat." Id. at 409.

The McShane Report, prepared five years after the 1999 BiOp, determined that the occupancy rate for unsurveyed Douglas fir stands is 15 percent, not five percent. See 2005 BiOp at 16. Accordingly, by adding 10 percent to the occupancy rate indices in the 1999 BiOp, 925 additional acres of occupied habitat available for harvest exist on PALCO lands, in excess of what was contemplated by the Take Permit. Id.

---

[7]The only exception is the that the "California" scale does not include Zone 4 in its entirety.

27

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The 2005 BiOp accepts that "an additional 925 acres of murrelet habitat . . . is likely to be occupied and available for harvest under the PALCO [Take Permit]."  2005 BiOp at 16. It then explains, however, that

> [b]y also adding 10 percent to the occupancy rate for this area, an additional
> 1,635 acres of "likely to be occupied habitat" would be available to the
> murrelet in protected areas in the adjacent [Humboldt Redwoods] State Park.
> Therefore, although the 1999 [BiOp] underestimated the acres of occupied
> habitat that would be lost under the PALCO [Take Permit] by 925 acres, the
> additional 1,635 acres of occupied habitat in the adjacent State Park would
> more than offset the underestimation of likely occupied habitat loss expected
> under the PALCO [Take Permit] when evaluating the impacts at the bioregion,
> Conservation Zone, and range-wide scales.

2005 BiOp at 17.  The net result is that the increased occupancy rate leads to a net gain of 610 acres of likely occupied murrelet habitat in the SH bioregion.

Plaintiffs contend that the Take Permit quantifies the level of authorized take in terms of the habitat affected and value of the habitat, so offsetting the additional loss of occupied habitat on PALCO lands by the increased amount of occupied lands on the adjoining State Park is not rational.  Pl.'s Mot. at 17. At oral argument plaintiffs also cited a portion of the Take Permit that recites "that maintenance of the marbled murrelet populations on private lands is critical in arresting the decline of the species in the next 50 to 100 years."  See Take Permit at 79.  The question, then, is whether the issuance of the Take Permit was based solely on the amount of anticipated occupied habitat lost by PALCO's proposed logging, independent from the amount of occupied and protected habitat within the Bioregion.

The 1999 BiOp gives several reasons for its determination that PALCO's proposed action will not likely jeopardize the continued existence of the murrelet or destroy its habitat. Two of those reasons are relevant here:  (1) "It is estimated that the proposed action will remove approximately 21.7 percent of the likely habitat in the Bioregion, 3.6 percent in [Zone 4], and 0.67 percent in the listed range . . . "; and (2) "[Federal Defendants] believe[]

28

United States District Court

For the Northern District of California

1   that the [Zones], the Headwaters stand, and nearby State Parks protect most of the breeding

2   murrelets and have a reasonable likelihood of maintaining a viable subpopulation in the

3   Bioregion." 1999 BiOp at 400.  This reasoning demonstrates that the Take Permit was issued

4   based on assumptions as to occupied murrelet habitat in the Bioregion, and not just on the

5   number of occupied acres on PALCO's lands.  Moreover, the 1999 BiOp anticipates that

6   State Parks will protect breeding murrelets.  Therefore, the 2005 BiOp's conclusion that the

7   increased number of occupied acres on PALCO lands is offset by the greater increase of

8   occupied and protected acres on the adjoining State Park land, was rational, or, at a

9   minimum, plaintiffs have not demonstrated that serious questions exist as to this issue.

10

11          d.      Impacts of Past Conservation Plan/Take Permit Violations

12          Finally, plaintiffs argue that the 2005 BiOp glosses over 325 reported violations of the

13  Conservation Plan; specifically, the 2005 BiOp (1) does not consult with NOAA regarding

14  the impact of violations of "no-cut" riparian zones on threatened coho salmon, chinook

15  salmon and steelhead trout; and (2) only addresses 26 of the 325 reported violations and

16  irrationally concludes that PALCO's 81 percent compliance rate with the Conservation Plan

17  does not jeopardize the murrelets.

18

19          With respect to the first argument, plaintiffs' fifteenth claim for relief does not

20  mention threatened fish; instead, it is limited to the marbled murrelet.  See Supp. Pleading to

21  SAC at ¶¶ 11-17.

22

23          As to the second argument, the 2005 BiOp states that the Service "reviewed the

24  monitoring reports and concluded that none of the incidents of deviation from the

25  [Conservation Plan's] requirements . . . rose to the level of a permit violation that would

26  warrant suspension or termination of the" Take Permit.  2005 BiOp at 4.  The Service

27  likewise concluded that "[n]one of the incidents considered individually or collectively have

28  resulted in significant impacts to the listed species . . . beyond the level of impacts

anticipated under the 1999 [BiOp]."  Id.   Plaintiffs have not demonstrated this determination is arbitrary and capricious.  For example, the 2005 BiOp indicates that seven of the violations reported "harvesting of portions of stands that were not included in the list of stands sent to the [Federal Defendants] for release."  See 2005 BiOp at 4.  The Service concluded that the stands would have been released in any event, so the violations do not threaten the murrelets or their habitat.  Id.  Plaintiffs have failed to identify any specific violations that render the Service's conclusion irrational.

The fact that the Take Permit states that it is "subject to full compliance with, and implementation of, Pacific Lumber's Habitat Conservation Plan (HCP) and executed Implementation Agreement (IA), all of which are hereby incorporated into the permit," does not mean that *any* violation of the Plan, or even several violations of the Plan, necessarily undermine the Service's conclusion that PALCO's proposed logging does not jeopardize the species.  Again, plaintiffs have failed to identify any evidence that suggests that PALCO's violations jeopardize the marbled murrelet.

## CONCLUSION

For the foregoing reasons, the Court rules as follows:

1.    Defendants' motion for summary judgment of the second and seventh claims for relief is GRANTED;

2.    Defendants' motion to strike plaintiffs' exhibits in support of their motion for a preliminary injunction is DENIED; and

3.    Plaintiffs' motion for a preliminary injunction is DENIED.

**IT IS SO ORDERED.**

Dated: November 10, 2005                    _____

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28